**John E. JONES and Janice Jones, Plaintiffs,**

v.

**The GOODYEAR TIRE AND RUBBER COMPANY, et al., Defendants.**

No. 86–4024.

United States District Court, C.D. Illinois.

July 10, 1991.

Glenn F. Ruud, Rock Island, Ill., Thomas D. Nissen, Chicago, Ill., for plaintiffs.

Steve Naughton, Chicago, Ill., Peter H. Lousberg, Rock Island, Ill., Dennis R. Fox, Moline, Ill., Frances E. Prell, Chicago, Ill., for defendants.

## ORDER

MIHM, District Judge.

Before the Court are a Motion by the Plaintiffs for sanctions against Defendant Goodyear Tire and Rubber Company ("Goodyear") (# 78) and Motions by Defendant Firestone Tire and Rubber Company ("Firestone") and Goodyear for an order (# 114 and # 116) certifying an interlocutory appeal under 28 U.S.C. § 1292(b). This Court grants both of these Motions.

## JURISDICTION

This product liability action was originally filed in the Circuit Court of the Fourteenth Judicial Circuit, Rock Island County, Illinois against Goodyear. Goodyear removed this case pursuant to 28 U.S.C. § 1441(a) and (b) as there was complete diversity of citizenship between Goodyear and the Plaintiffs under 28 U.S.C. § 1332. The Plaintiffs are both citizens of the State of Illinois, and Goodyear is an Ohio corporation with its principal place of business in Akron, Ohio. On July 3, 1986, the Plaintiffs amended their Complaint adding Firestone as a Defendant. The addition of Firestone did not destroy diversity as Firestone is an Ohio corporation whose principal place of business is in Ohio.

## FINDINGS OF FACT

Goodyear's local attorney, Peter Lousberg, signed a Stipulation and Protective Order on May 16, 1986 and he later agreed to an Addendum to the Protective Order which included the Goodyear side ring allowing Goodyear 45 days from May 16, 1986 to examine and inspect the side ring and rim base without destructive testing. Specifically, Goodyear agreed to the entry of the Protective Order requiring it to "preserve, keep safe and maintain the rim base [and side ring] in an unaltered state" while in Goodyear's custody.

In May 1986, Steven McManigal, the local Rock Island, Illinois Goodyear store manager, was asked by Ed Jano, a Goodyear products service representative in Chicago, to pick up and take physical custody of two pieces of a multi-piece truck tire rim, i.e., rim base and side ring, from the offices of a private investigator in Rock Island, Illinois. (Report of Proceedings of Evidentiary Hearing on 11–9–91,[1] Document # 112 at 6–7).

On May 16, 1986, McManigal met Goodyear's local attorney at the private investigator's office in Rock Island and signed a receipt acknowledging the transfer of custody of the rim base and side ring. (R. at 8).

McManigal was advised by Ed Jano that he should ship the rim base and side ring to a J.G. Gerbeth at the Metals Product Division of Goodyear in Akron, Ohio, via United Parcel Service (UPS). (R. at 8–10).

Neither Jano nor other Goodyear employees or attorneys provided McManigal with special instructions regarding the proper method of shipment of the rim base and side ring to Goodyear in Akron. McManigal received no specific packaging instructions, no instructions as to whether the item should be shipped via air freight or ground transportation, and no instructions as to whether the two rim pieces should be shipped separately. (R. at 8).

McManigal did not discuss with anyone why the rim base and side ring were to be picked up and sent to Goodyear Akron. (R. at 9).

McManigal was made aware from attorney Lousberg prior to his actual shipment of the rim base and side ring to Goodyear

---

1. The Report of the Proceedings of the Evidentiary Hearing held on November 9, 1991 will hereinafter be referred to as "R".

of the existence of a Stipulation and Protective Order applicable to the custody of the two pieces while in the possession of Goodyear. (R. at 10).

McManigal was unaware and did not discuss the specifics of the Protective Order with Goodyear's attorneys or employees and he did not know that a federal lawsuit was pending against Goodyear which claimed that some defective aspect of the rim base and side ring may have caused personal injury. (R. at 11).

McManigal was not instructed by anyone to put the items in cartons or cardboard boxes or to ship them separately or protect them with type of covering. McManigal could not recall any instructions given to him about how to ship the items in order to comply with the Protective Order. (R. at 12).

McManigal did not speak with someone with the Metal Products Division of Goodyear in Akron before the actual shipment because he had simply been advised to ship the two items via UPS with separate tags. (R. at 41–42). McManigal called UPS the day before the shipment to arrange to ship a steel rim base of approximately 46 pounds from the Rock Island Goodyear store to the Metal Products Division at Goodyear Akron, Ohio. McManigal provided UPS with the shipment address given to him by Ed Jano as follows: 1376 Techway Drive, Akron, Ohio 44326. (R. at 12–15).

On May 22, 1986, McManigal gave the rim base and side ring (which he had personally taped together with two shipping tags) to a UPS delivery man, James Chambers. McManigal wrote "Goodyear Metals Products, J.G. Gerbeth, 1377 Techway Drive" on each shipping tag. McManigal did not speak with or inform Gerbeth of the shipment prior to actual shipment to Goodyear in Akron. (R. at 17–18).

The decision on how to package the items for shipment was McManigal's alone. (R. at 20). McManigal put the side ring on top of the rim base and taped them together with cellophane tape which left approximately 50% of the rim base edges untaped and exposed. McManigal placed one tag on the side ring and taped it on and then placed another tag on the rim base itself and taped it on. (R. at 24).

McManigal did not ask Chambers for advice or instructions on how to package the items properly for shipment. Chambers did suggest that the exposed sharp and protruding edges of the rim base should be covered with some additional tape which Chambers placed around the rim base. McManigal did not inform Chambers that the items being shipped were irreplaceable evidence in a pending lawsuit, and he did not tell Chambers that it was important that the items not be damaged or separated in transit. (R. at 27).

In Chambers's experience as a UPS pick up and delivery driver since December of 1975, he could not recall any time when he has picked up a heavy metal tire rim for shipment that was not in a carton or box. (R. at 69–70).

McManigal had no knowledge regarding how long it would take UPS to ship the two items from Rock Island to Goodyear in Akron. He was unaware that UPS had guidelines on approximate shipping times. He made no inquiries of Goodyear employees or the UPS regarding how many days the shipment would take to arrive at Goodyear Akron. (R. at 28).

McManigal does not recall informing anyone at Goodyear in Akron that the shipment had left his possession on or about May 22, 1986. (R. at 28). He recalled that it was sometime within 60 days after the shipment that he received a telephone call from someone at Goodyear in Akron advising him that the shipment had not arrived at Goodyear in Akron and that he should put a tracer on the shipment through UPS. (R. at 30–31). McManigal believed this initial telephone call may have occurred two, three, or four weeks after the shipment. After he called UPS to place a tracer and providing them with the date of the shipment, the UPS called McManigal back and advised him that the shipment was delivered to Goodyear in Akron. Sometime later, McManigal learned that the side ring had not been received by Goodyear in Akron along with the rim base. (R. at 33–34).

Prior to shipment, McManigal never inquired about or discussed the UPS guidelines regarding how metal products should be shipped or packaged. McManigal was not familiar with UPS's customer brochure entitled "Package with Care" which provided instructions that all sharp or protruded edges of irregularly shaped metal objects should be blunted with taped or corrugated pieces to protect those surfaces. (R. at 37–38).

McManigal expressed no reason why he did not place the rim base and side ring in a corrugated box for shipment or ship the items separately. He was familiar with having receiving custom rims from various manufacturers in corrugated boxes. (R. at 39).

McManigal only knew that the items were being shipped because Goodyear's Metal Division wanted to examine the pieces to "know the content of the metal or something" and that was all he knew. (R. at 44). He maintained no shipping log at the Goodyear store in Rock Island, and he did not maintain a check list of when items were shipped or received. (R. at 44).

Michael Quinn, local manager for UPS for the Rock Island, Illinois area stated that UPS had a policy published in its customer brochures, e.g., "Package with Care" providing guidelines for packaging and labeling irregularly shaped and bare metal items for shipment by UPS. (R. at 46). Quinn stated that irregularly shaped corners should be blunted by having cardboard put over it with tape to keep the edges from striking other packages causing damage or injuries to employees and to avoid the possibility that these items would get caught on or catch on mechanical conveyors or elevators in shipment. (R. at 49–50).

Quinn stated that the guidelines require that a label put under tape should be adhered to each item and that a "fly tag" or label not affixed to the metal pieces should not be used as they get caught in mechanical systems and get torn off, which prevents UPS from knowing who the sender is and where the item is to be shipped. (R. at 51). Quinn stated that he advises customers that identification tags and labels should not be affixed to the packaging but to the items themselves. (R. at 51). He stated that it is UPS's policy not to accept items which the customer states are non-replaceable and to refer such customers to alternate carrier methods. (R. at 53).

Quinn stated that a customer can elect to use tape to package metal pieces. (R. at 54). However, he noted that the Rock Island area UPS store sells corrugated boxes for approximately $2.50 which would be the appropriate size for the rim base and side ring. (R. at 55).

Quinn stated that the time for a ground shipment of the rim base and side ring would have been two to three working days based on zone delivery guidelines published in their customer brochures. (R. at 58).

Quinn stated that the UPS's policy is that customers are expected to take responsibility for the manner in which items are packaged. The UPS's pick up drivers are not instructed to tell customers whether they should put items in a box or whether they should tape them. (R. at 60).

Quinn stated that if an item fell out of a package or the label fell off during the UPS shipment, the item would be held for 24 hours at the local building where it separated, and, then, it would be sent to the Addison, Illinois, to an overgoods facility where it is held for 48 hours. After that, it would be sent to the UPS national overgoods center in Atlanta, Georgia. (R. at 62).

If UPS had been notified right away that the side ring had not arrived at its proper destination along with the wheel rim, it might have been possible for UPS to run an effective trace on the side ring and retrieve it prior to it being discarded at the Atlanta facility.

J.G. Gerbeth, the former manager of the Design and Development Department and Quality Control Division of Goodyear Metal Products, was responsible for performing evaluations and engineering analysis on metal parts and rims involved with explosive separations in the field during the 1970's and 1980's. Prior to examining the

rim base in this case, he had performed evaluations and engineering analysis on at least 90 such claims, and he continued to provide this service to Goodyear as an independent contractor after his retirement date on March 31, 1989. (R. at 73–76).

Gerbeth has a routine in performing engineering analysis to ascertain product defects and to determine failure modes in explosive separations of split rim wheel components. (R. at 76). Gerbeth's analysis includes assessment of:

all types of evidence as to the sizing, the manufacturing, the compatibility and what might [have caused] a separation ... I like to look at all the components that are involved with an unintended separation.

(R. at 77). Gerbeth examined the rim base in this case very thoroughly but had only photographs of the side ring. Gerbeth wrote a report and drafted a number of drawings with critical measurements to determine the size, shape and condition of the rim base. (R. at 79). Gerbeth routinely would use special engineering tools to ascertain critical dimensions, i.e., circumference, size, depth, and metal thickness to accurately determine whether a part involved in an explosive separation met original manufacturing specifications. (R. at 82).

Gerbeth stated that the split rim assembly consists of two pieces designed to clamp and fit together in an "interference fit." (R. at 82). Proper interference fit requires that the parts meet manufacturing specifications so that they will be seeded properly, i.e., the side ring fits in the rim base gutter hook and snaps in place to insure proper seeding. Lack of proper "interference fit" could prevent proper seeding of the side ring into the rim base so that the two pieces might not lock together under pressure. (R. at 83).

With photographs of the side ring alone, Gerbeth was, of course, unable to physically assemble the side ring and rim base together to determine whether they had a proper interference fit. (R. at 84). Without physical examination of the side ring he could not determine if the side ring had any cracks or whether it was "out of round" nor was he able to accurately measure its width or depth. (R. at 85). Without inspecting the side ring with proper tools in his laboratory, Gerbeth could not with a reasonable degree of engineering certainty determine whether the side ring met the original equipment manufacturer's [Goodyear] specifications. (R. at 86).

Gerbeth stated that the rim base and side ring are technically designed compatible but could be physically incompatible if one of the components failed to meet original equipment manufacturer's specifications. (R. at 87). Without being able to examine the side ring, Gerbeth could not within a reasonable degree of engineering certainty determine whether there was a physical incompatibility of the side ring to the rim base in this case. (R. at 87).

Gerbeth stated that to be able to determine the cause or contributing cause of the split rim separation of two different manufacturer's parts, i.e., Goodyear's side ring and Firestone rim base, he would like to have both of those parts to do a complete engineering analysis. (R. at 89). Without both the parts, Gerbeth stated he may be handicapped in determining how each part may have contributed to a failure within a reasonable degree of engineering certainty. (R. at 89–90).

Gerbeth was not informed by McManigal that the shipment of the rim base and side ring was sent on or about May 21, 1986, and he was not involved in receiving the items at Goodyear in Akron. (R. at 90). Gerbeth did not speak with McManigal before the shipment and gave no special instructions regarding how the rim base and side ring should be shipped or packaged. Gerbeth did not know when the items were supposed to be received nor was he notified by McManigal that the items had been shipped to him. (R. at 92).

Gerbeth was informed by another Goodyear employee, Mr. Boyd, that the shipment was received on May 27, 1986. Sometime later Gerbeth searched for the items in various departments of the Goodyear technical center in Akron. Gerbeth determined that only the rim base had been

received and not the side ring, but he did not call McManigal in Rock Island or any of the attorneys for Goodyear at that time. (R. at 92–95).

Gerbeth called McManigal sometime in August 1986. One of Gerbeth's notes indicates that he had a conversation with McManigal on August 16, 1986. McManigal advised Gerbeth that he would initiate a trace on the side ring through UPS. (R. at 96–97). Gerbeth had not been advised by McManigal or any of the Goodyear attorneys when to expect receipt of the rim base and side ring from its initial shipment on May 21, 1986. Gerbeth stated that he would ordinarily like the metal rim components involved in unintended separations to have their integrity maintained in shipment so the parts are protected from further damage or separation in transit. (R. at 97).

Gerbeth was unaware that a Protective Order had been entered in the federal court regarding Goodyear's responsibility to maintain, preserve and keep safe the rim base and lock ring while in their custody. (R. at 99). After completing his examination of the Firestone rim base, Gerbeth arranged to have the rim base delivered to the Collins Test Lab in Twinsburg, Ohio. Shipment was made personally in Gerbeth's automobile with the rim base placed in a box. (R. at 102–103).

One of Plaintiff's attorneys, Glen Rudd, was first advised by Goodyear that the side ring was "missing" on August 20, 1986, by a telephone message received from the law offices of Goodyear's attorney. Between May 16, 1986 and August 20, 1986, Plaintiff's counsel were unaware that the side ring was lost and missing. (R. at 112).

Jack Campau, Plaintiff's engineering expert, performed an engineering analysis of the Firestone rim base but had no opportunity to physically examine the side ring. (See the Supplemental deposition of Jack Campau taken on March 13, 1991 at pages 7–8).[2]

Campau stated that it is important to have both components of a split rim assembly to do a complete engineering analysis to determine whether the actual physical measure of each part is in compliance with the design drawings and specifications. (D. at 11–12). Campau stated that in order to verify whether a side ring actually is compatible and complies with the manufacturer's drawings and specifications he would have to make measurements, weigh it, and compare it with the original design drawings. Critical measurements would be those related to how the toe of the side ring fits into the grove of the rim base as well as the cross sectional dimensions, circumference, and diametrical measurement. (D. at 14).

Campau stated that without physically examining and verifying the side ring's dimensions and weight, etc., an expert cannot verify whether a side ring is physically compatible with another manufacturer's rim base. Campau was not able to verify with any degree of engineering certainty whether the missing side ring and rim base were physically compatible. (D. at 16–17). Campau stated he would have to examine the actual side ring and compare it to a new side ring and the design drawings in order to determine if the subject side ring departs from the way it is supposed to be manufactured. (D. at 19)[3].

Campau stated that a physical incompatibility can exist due to a departure from the design specifications and that departure from design affects holding capability. (D. at 22).

Campau testified that without the actual side ring for engineering analysis, there is limited evidence to determine the mode of failure [explosive separation]. (D. at 23).

Campau was unable to ascertain whether there was any metallurgical deficiencies in the hardness, ductility, or brittleness of the side ring or to conduct any chemical analy-

---

2. This deposition will hereinafter be referred to as "D".

3. Goodyear and Firestone both object to the admission of Campau's testimony because they assert that it is inconsistent with his prior state-

ments. This Court does not believe that his prior testimony is necessarily inconsistent because the testimony involved the design issue rather than the product defect issue.

sis to determine whether there was non-compliance with design specifications. (D. at 24–25). Campau testified that without the side ring he could not determine or verify the roundness or "out of round" condition of the side ring or ascertain the magnitude of distortions. (D. at 26).

Campau stated that if he had both of the split rim parts he could fit the side ring on the rim base to determine whether the condition of the side ring when compared with the rim base should have alerted the man who last assembled it of a physical incompatibility of the parts. Without physical examination of the side ring, Campau could not ascertain whether cracks, distortions, depth of corrosion, or other deficiencies may have contributed to the rim's unintended separation. (D. at 27–28).

Campau stated that if he had the benefit of physical examination of both the rim base and side ring he could have assembled them together to ascertain their relative positioning to determine the exact way the side ring came off and the sequence of events leading to the unintended separation. (D. at 29). Campau stated that without the ability to place the two components together and simulate an assembly, he would not be able to determine whether it would have been inadvisable for the last person assembling the two pieces to assemble them together. (D. at 30).

Campau stated that if he could have performed a simulated assembly he could determine how much the interference fit had been reduced so that he could assess the relative degree which each product contributed to the lack of interference necessary to avoid unintended separation. Absent physical examination of the side ring, Campau was not able to state with a reasonable degree of engineering certainty his opinion regarding the degree that the Goodyear side ring may have contributed to the separation. (D. at 34).

Without the benefit of physical examination of the Goodyear side ring, Campau's opinions directed to product defects were limited to design. Campau stated that split rim wheel assemblies are defective and unreasonably dangerous by their inherent de-sign. Physical examination of the side ring was not essential to Campau's design defect opinion. However, Campau was unable to determine whether a manufacturing defect or condition of physical incompatibility with Goodyear's own design specifications existed without physical examination of the side ring itself.

Campau stated that he had previously performed physical examinations on split rim side rings and found metallurgical defects, metal pieces missing, cracks, distortions and metal fatigue related to manufacturing defects. (D. at 38–41).

## CONCLUSIONS OF LAW

■ The Stipulation and Protective Order created a duty upon Goodyear to exercise special care to "preserve, keep safe and maintain the [side ring] in an unaltered state and do no destructive testing" while in Goodyear's possession for 45 days commencing May 6, 1986;

Goodyear violated the Protective Order and was grossly negligent in the exercises of their duty by:

A. its failure to take adequate precautionary measures to preserve the integrity and safety of the side ring. Clearly, Goodyear's acts and omissions taken in packaging, labelling, and shipping the rim base and side ring to Goodyear in Akron, Ohio were grossly negligent in that Goodyear failed to take any significant precautions to protect the side ring and rim base, and it failed to comply with the guidelines set forth by the shipper it chose, the UPS;

B. its failure to timely monitor the UPS shipment and delivery to Goodyear in Akron, Ohio and monitor the apparent separation and misdelivery of the side ring;

C. its failure to timely investigate the misdelivery and lost side ring by initiating a timely trace through UPS internally;

D. its failure to timely notify Plaintiff's counsel of the missing side ring when it may have been possible for Plaintiff to initiate their own investigation and independently trace the side ring through the UPS.

This Court further concludes as follows:

Plaintiffs and Defendant Firestone were not at fault for the loss or failure to recover the Goodyear side ring. Goodyear's side ring was material and irreplaceable evidence necessary to establish Plaintiffs' theories of a manufacturing defect or deviation from design specification. In this type of case, physical examination by a qualified engineer would be necessary to ascertain whether the Goodyear side ring deviated from its design and manufacturing specifications. Physical examination by qualified engineering expert would be necessary to do a complete analysis of the relative contribution the rim base and side ring may have made to the explosive separation that caused injury to the Plaintiff. The loss of the side ring has substantially prejudiced the Plaintiffs' ability and opportunity to establish and prove the existence of a manufacturing defect that may have proximately caused or contributed to the Plaintiff's injuries.

Therefore, the Plaintiffs' Motion for Sanctions is granted. Substantial justice requires that a directed verdict be entered in favor of the Plaintiffs and against Goodyear on the claim for liability based upon negligent manufacturing.

The Court's conclusion that the sanction imposed in this case is appropriate is derived from this Court's inherent power to enforce its orders. *See, Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980); *Link v. Wabash Railroad,* 370 U.S. 626, 630, 82 S.Ct. 1386, 1388, 8 L.Ed.2d 734 (1962); note, *A Private Litigant's Remedies for an Opponent's Inappropriate Destruction of Relevant Documents,* 61 Texas Law Review 1185, 1228–1232 (April 1983). Although the sanction imposed in this case may seem draconian, this Court believes that it is a necessary sanction given the alternatives in this case. If the Plaintiffs must proceed without the lost evidence, there is no chance that the Plaintiffs could prevail on the negligent manufacturing claim. Thus, Goodyear will profit from its gross negligence in mishandling this evidence despite the clear language in the protective order requiring Goodyear to protect this evidence. This Court believes that allowing such a result undermines the ability of any court to require respect and obedience to its orders, particularly its protective orders. If parties cannot rely on the Court to enforce protective orders with appropriate sanctions, then the efficiency and fairness of the discovery process is undermined. In a case which did not involve a protective order where an expert destroyed evidence in testing, one court stated the rule that:

> When an expert employed by a party or his attorney conducts an examination reasonably foreseeably destructive without notice to opposing counsel and such examination results in either negligent or intentional destruction of evidence, thereby rendering it impossible for an opposing party to obtain a fair trial, it appears that the court would be not only empowered, but required to take appropriate action either to dismiss the suit altogether, or to ameliorate the ill-gotten advantage. A presumption as to certain evidence is simply not sufficient to protect against such conduct.

*Barker v. Bledsoe,* 85 F.R.D. 545, 547–548 (W.D.Okla.1979).

Goodyear suggests that this Court should impose a lesser sanction against it, such as imposition of a presumption that the evidence in question would tend to show that Goodyear was negligent, which presumption could be rebutted by other evidence. This Court rejects this suggestion because it believes that such a sanction would be inadequate. Because no one will ever know what the evidence might have shown, the jury could not make a rational decision based upon the evidence.

Goodyear, however, maintains that it is inappropriate for this Court to direct a verdict where the Plaintiffs have failed to show prejudice because of the speculative nature of their proof. This Court rejects Goodyear's argument and finds that the Plaintiffs have shown prejudice in this case. The Plaintiffs were prejudiced because they were denied the opportunity to gather highly probative and relevant evidence. Goodyear might be correct in asserting that this type of prejudice is insuffi-

cient where there was no protective order in place. However, where there is a clear protective order in place as in this case, this Court believes that the Plaintiff's showing of prejudice is sufficient. In this case it would be unfair to the Plaintiffs to require a further showing of prejudice based on the evidence because Goodyear's conduct has made this impossible. Furthermore, requiring the Plaintiffs to show prejudice based upon the evidence would undermine this Court's authority to enforce its orders. (See earlier discussion in this order at page 664).

■ This Court further finds that, under the circumstances of this case, the question of whether it is appropriate to grant a directed verdict on the negligent manufacturing claim is a proper question to certify for an interlocutory appeal under 28 U.S.C. § 1292(b). The question of whether a directed verdict should be entered on this claim is clearly a controlling question of law. Further, there is a substantial ground for difference of opinion on this question because this Court has been unable to find any controlling authority on point.[4] Also, because of the harsh nature of the remedy which appears to be necessary in this case, this Court believes that there is a substantial ground for difference of opinion regarding whether this harsh sanction should be applied.

In addition, this Court believes that an immediate appeal from the order would materially advance the ultimate termination of this litigation. In this case there are, of course, two Defendants, Firestone and Goodyear. There are negligent design defect counts and negligent manufacturing counts against both Defendants. Since Firestone has not engaged in any misconduct, the negligent manufacturing claim

against it will still go to trial. If this Court's ruling against Goodyear is ultimately overturned on the negligent manufacturing claim, this would necessitate a second trial on this claim when it had already been tried against Firestone. Further, as Goodyear asserts, it will be very difficult to frame the jury instructions, special interrogatories, and special verdict forms in such a way to insure that all the parties are insured a fair trial on the remaining issues if this case proceeds to trial in its present posture.

### CONCLUSION

Based upon the foregoing, this Court GRANTS the Plaintiffs' Motion for Sanctions against Goodyear (# 78), and this Court GRANTS Goodyear's and Firestone's Motion for an Order (# 114 and # 116) certifying an interlocutory appeal under 28 U.S.C. § 1292(b).

ENTERED.

---

4. This Court has looked at a number of cases and articles, but has failed to find any authority regarding when it is appropriate for a court to enter a directed verdict under the circumstances presented in this case. The *Roadway Express* case and the *Link* case which were cited earlier provide the authority for a court to use its inherent power to dismiss a case; however, they do not provide the standards governing when dismissal is appropriate. *See, Roadway Ex-*press, 447 U.S. at 764, 100 S.Ct. at 2463; *Link*, 370 U.S. at 630, 82 S.Ct. at 1388. Further, the other articles and cases the Court has looked at involve Rule 37 of the Federal Rules of Civil Procedure and are thus inappropriate to apply to the facts of this case. *See, Cine v. Allied Artists*, 602 F.2d 1062, 49 A.L.R.Fed. 820, 820–835 (2nd Cir.1979); *Hindmon v. National–Ben Franklin Life Insurance Corporation*, 677 F.2d 617, 620 (7th Cir.1982).