MILDRED SHIMANOVSKY *et al.*, Plaintiffs-Appellants, v. GENERAL MOTORS CORPORATION, Defendant-Appellee.

First District (1st Division)    No. 1—92—4386

Opinion filed November 21, 1994.—Rehearing denied April 5, 1995.

John B. Schwartz & Associates, of Chicago (John B. Schwartz and Stephen J. Caron, of counsel), for appellants.

Lord, Bissell & Brook, of Chicago (David R. Reed, Hugh C. Griffin, and John T. Williams, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiffs Mildred and Almarvin Shimanovsky appeal an order of the circuit court of Cook County dismissing their product liability complaint against defendant General Motors Corporation (GM) as a discovery sanction pursuant to Illinois Supreme Court Rule 219 (134 Ill. 2d R. 219).

The record on appeal, including the pleadings and discovery materials, indicates the following facts. Plaintiffs filed this product liability complaint against GM on June 16, 1986. The complaint alleges that on July 7, 1985, while travelling northbound on Interstate 294 in Cook County, Mildred Shimanovsky lost power steering control

of her 1982 Chevrolet Caprice, an automobile designed, manufactured and distributed by GM. Mildred allegedly struck a guard rail on the right side of the road, then crossed all lanes of traffic and struck a concrete barrier on the left side of the road. Mildred claims this occurrence resulted in the loss of her right eye, both tear ducts and part of her skull, as well as the fracturing of her left wrist, right ankle, jaw, ribs, and nose. Almarvin Shimanovsky, Mildred's husband, claims the occurrence resulted in a loss of consortium. The complaint alleges that the accident occurred because the power steering in Mildred's 1982 Chevrolet Caprice was "defectively manufactured, fashioned, fabricated and designed" by GM.

On July 18, 1985, eleven days after the accident, plaintiffs' counsel retained John Stilson, a mechanical engineer, to investigate whether there was a problem with the car that would have caused the accident. Stilson inspected the automobile on the premises of Underwriter's Salvage Company, where the car had been towed at the request of plaintiffs' insurer. Stilson inspected many parts of the automobile, including the front and rear suspension; linkage, spindles and linkage connections for the front suspension; tires; steering column shaft connector; steering gear exterior; and brakes. This inspection did not show any defect that would result in an inability to control the automobile.

Stilson, however, asked plaintiffs' counsel for the authority to disassemble and inspect the steering gear itself, as the steering gear is an external component with internal systems. Stilson knew that if he found a defect after disassembling the steering gear, plaintiffs probably would file a product liability suit. Stilson did not recommend to plaintiffs' counsel that GM be notified of the disassembly of the steering gear. Stilson's firm is a member of the American Society for Testing and Materials (ASTM), whose guidelines require that an expert recommend to his or her client that other parties in interest be notified and afforded the opportunity to observe and record any examination likely to alter the state or condition of an item that may become involved in a product liability suit.

On September 20, 1985, Stilson drained the power steering fluid from the steering gear, cut the hydraulic power steering lines and removed the steering gear from the automobile. Stilson then disassembled the steering gear. Stilson's inspection indicated that various components of the steering gear had been damaged as a result of the accident. Stilson also noticed that the valve body had worn grooves into the inner bore of the housing. Stilson recommended to plaintiffs' counsel that a metallurgist be retained to determine whether these grooves were caused by the accident.

Plaintiffs retained Lyle Jacobs as their metallurgist. On September 23, 1985, Jacobs received the steering gear housing, valve body and valve seals for analysis. Jacobs determined that the steering gear housing and valve body would need to be sectioned or cut because there was no nondestructive way to determine the cause of the grooves in the inner bore of the housing.

In their discovery depositions, Stilson and Jacobs disagreed over who authorized the sectioning of the steering gear components. Stilson indicated that Jacobs and plaintiffs' counsel made the decision. Jacobs indicated that he had sought authorization from Stilson because "sometimes by court order you are prohibited from doing any destructive testing." Jacobs indicated that Stilson mentioned the possibility of litigation. Like Stilson's firm, Jacobs was a member of ASTM. Indeed, Jacobs was a member of the ASTM committee that drafted the aforementioned testing disclosure guidelines. Stilson and Jacobs, however, indicated that they were not aware of the ASTM guidelines in 1985.

Jacobs performed destructive testing of the steering gear components in October 1985. The steering gear housing was sectioned. The valve body, with three attached seals, was also sectioned. Five cross-section samples of the housing and valve body were mounted in bakelite molds. Other cross-section samples were subjected to chemical analysis.

Based on the aforementioned tests, Jacobs concluded that the grooves were the result of long-term wear, as opposed to impact damage. Jacobs provided a report and 27 photographs in support of his conclusion. In turn, Stilson told plaintiffs' counsel that the wear and deterioration in the steering gear assembly caused the accident. Stilson opined that the wear marks compromised the steering gear seals, causing internal leakage of power steering fluid, resulting in the malfunction of the steering gear. Plaintiffs filed suit after receiving these opinions.

Pretrial proceedings and discovery ensued. The record does not clearly indicate when GM learned of the nature of the examination and testing of the steering gear. On July 24, 1986, GM filed a notice pursuant to Supreme Court Rule 214 (134 Ill. 2d R. 214) seeking, among other things, production of any document concerning expert examinations and any expert reports. The notice however, did not seek production of the automobile or any of its parts. On March 11, 1987, plaintiffs filed answers to interrogatories that indicated that the power steering system had been examined or tested by experts and that a report had been prepared regarding one of the examinations. The record does not indicate when GM received any such

report, aside from an oral representation to the trial court by plaintiffs' counsel that it sent a report to GM "early on." According to GM's motion to dismiss and bar, its representatives were first allowed to view the automobile and its parts on September 28, 1989.

On April 12, 1990, the parties filed a stipulation for a protective order providing that each part of the 1982 Chevrolet Caprice in question shall be preserved and generally not subject to destructive inspection, testing or disassembly, except under conditions specified in the stipulation. On December 23, 1991, GM moved to compel production of the components of the steering gear and to possess the parts for visual inspection from January 8, 1992, through February 10, 1992; this motion was granted on December 31, 1991.

On January 28, 1992, plaintiffs' counsel notified GM's counsel by facsimile that plaintiffs had retained Larry Bihlmeyer as an expert witness. The record indicates that Bihlmeyer is a mechanical engineer. Bihlmeyer opined in a deposition that there were a number of defects in the design and manufacture of the steering gear and its components that caused the steering gear to malfunction; two examples follow. Bihlmeyer stated that there was an improper fit between the O rings, the teflon rings, the valve body and the housing body from a design standpoint such that there was no "squeeze" to help maintain alignment in the manufacturing process. Bihlmeyer also opined that there was a manufacturing defect insofar as the metal lands on the control valve body were not rounded and the sharp edges of the lands would contribute to high stress concentration factors during metal to metal contact, which would lead to smearing of the metals, slivers and contamination.

On February 10, 1992, GM filed answers to interrogatories indicating that it might call three expert witnesses: Donald Miller, James Willis and Robert O'Shea. Miller and Willis were engineers employed by GM's Saginaw Division, where they had duties relating to the design and testing of steering gears. O'Shea was listed as a metallurgical engineer. Miller and Willis concluded that there was no defect or unreasonably dangerous condition in Mildred's 1982 Chevrolet Caprice that caused or contributed to the accident. All three of GM's experts concluded that

> "the destruction of the steering gear by plaintiffs' experts without notice to General Motors violated engineering ethics, failed to produce evidence that could not be obtained by other means, and deprived General Motors of the opportunity to show the jury further evidence of the proper manufacture and operation of the gear."

In discovery depositions, Miller and Willis indicated that disassembly of the steering gear was an accepted practice, but objected to the cutting of the housing, valve body and seals.

In their depositions and in affidavits submitted in support of GM's motion to dismiss or bar, Miller and Willis discussed the effect the examination and testing of the steering gear had on GM's ability to defend against plaintiffs' complaint. For example, Miller and Willis indicated that the destructive testing prevented them from performing a manual function test, in which the stub shaft of the intact steering gear would be rotated to determine whether the gear was operating properly and whether any internal components were damaged. According to Miller and Willis, such a test could have rebutted the theory that there was binding in the steering gear at the time of the accident. Miller and Willis indicated they were also precluded from performing a similar test with the steering gear connected to a power supply. Miller and Willis claimed such a test would have been able to affirmatively disprove Stilson's and Bihlmeyer's theories regarding leakage or binding in the steering gear. Furthermore, Miller and Willis indicated that the disassembly and cutting of the components precluded taking measurements that would have shown that the parts were manufactured and assembled to proper specifications with proper intercomponent fit. O'Shea echoed many of the concerns about the inability to measure the components and their fit within the steering gear assembly, adding that he believed the destructive testing was not appropriate or necessary to evaluate the cause of the wear on the components.

It is noted at this juncture that O'Shea and Jacobs appear to disagree over the necessity of destructive testing in this matter. It is also noted that Stilson testified that the damage done to the steering gear in the accident was such that a bench test might have further damaged the inside of the steering gear.

On September 11, 1992, plaintiffs filed a motion *in limine* that sought to bar GM from cross-examining plaintiffs' experts on the issue of destructive testing. GM filed its motion to dismiss the case or bar any evidence of the condition of the power steering gear as a sanction for violating discovery rules the same day. Following a hearing, the trial court denied plaintiffs' motion *in limine* and granted GM's motion to dismiss.

Plaintiffs filed a motion for rehearing on October 9, 1992, which argued in part that GM had not shown prejudice sufficient to mandate dismissal of the complaint. Plaintiffs included an affidavit tendered by Bihlmeyer opining that: (1) the data that would have been gathered by GM in testing the steering gear was not relevant to the design and manufacturing defects in the vehicle; (2) GM's

proposed testing would have damaged the steering gear such that plaintiffs' experts would have been unable to render an opinion about the cause of failure; and (3) the destructive testing of the steering gear did not hamper his ability to render his opinions. On November 9, 1992, the trial court held a hearing on the motion to reconsider. The transcript of proceedings indicates that the trial court indicated that perhaps he "should have brought all these experts in," but concluded that plaintiffs had violated the standards established by case law. The trial court denied plaintiffs' motion for rehearing. Plaintiffs timely filed a notice of appeal to this court.

## I

■ Supreme Court Rule 214 allows a party to request the production of tangible evidence for inspection and testing. (134 Ill. 2d R. 214.) Supreme Court Rule 219(c) authorizes the trial court to enter such orders as are "just" as a sanction for a party's unreasonable refusal to comply with requests for discovery, including the production of tangible evidence. (134 Ill. 2d R. 219(c).) The decision of whether to impose sanctions pursuant to Rule 219(c) (134 Ill. 2d R. 219(c)) and, if so, the type of sanction, is largely within the sound discretion of the trial court, and that decision will not be disturbed absent a clear abuse of discretion. (*Graves v. Daley* (1988), 172 Ill. App. 3d 35, 37, 526 N.E.2d 679, 680.) Similarly, the degree of the sanction is a matter within the trial court's discretion. (See *Kmoch v. Klein* (1993), 245 Ill. App. 3d 308, 312, 614 N.E.2d 508, 512.) We address the imposition of the sanction and its severity in turn.

## II

■ A party's noncompliance is "unreasonable," thereby warranting the imposition of sanctions, when there has been a deliberate and pronounced disregard for a discovery rule. (*Hartnett v. Stack* (1993), 241 Ill. App. 3d 157, 173, 607 N.E.2d 703, 714; see *Lavaja v. Carter* (1987), 153 Ill. App. 3d 317, 322, 505 N.E.2d 694, 698.) In determining whether a party's conduct has risen to the level of unreasonable noncompliance, a court may consider the importance of the information that has not been produced. (*American Family Insurance Co. v. Village Pontiac-GMC, Inc.* (1992), 223 Ill. App. 3d 624, 627, 585 N.E.2d 1115, 1118.) Preservation of the allegedly defective products in product liability cases is of the utmost importance to both the proof and defense of such cases. (*Ralston v. Casanova* (1984), 129 Ill. App. 3d 1050, 1057, 473 N.E.2d 444, 449.) The allegedly defective product, in the condition it was in at the time of the occurrence, is often important in determining whether a product is actually defective

and is usually far more instructive and persuasive to a fact finder than photographs or oral descriptions. (*American Family Insurance Co.*, 223 Ill. App. 3d at 627, 585 N.E.2d at 1118.) "As a matter of sound public policy, an expert should not be permitted intentionally or negligently to destroy such evidence and then substitute his or her own description of it." *American Family Insurance Co.*, 223 Ill. App. 3d at 627-28, 585 N.E.2d at 1118.

■ Consequently, Illinois courts have upheld sanctions for destruction of evidence in violation of a protective order and for failure to comply with discovery orders after evidence was inadvertently lost. *Ralston*, 129 Ill. App. 3d at 1050, 473 N.E.2d at 444; *Stegmiller v. H.P.E., Inc.* (1980), 81 Ill. App. 3d 1144, 401 N.E.2d 1156; see also *Marrocco v. General Motors Corp.* (7th Cir. 1992), 966 F.2d 220; *State Farm Fire & Casualty Co. v. Frigidaire, a Division of General Motors Corp.* (N.D. Ill. 1992), 146 F.R.D. 160; *Jones v. Goodyear Tire & Rubber Co.* (C.D. Ill. 1991), 137 F.R.D. 657, *aff'd* (7th Cir. 1992), 966 F.2d 220. *Contra Applegate v. Seaborn* (1985), 132 Ill. App. 3d 473, 477 N.E.2d 74 (sanction reversed where there was no showing that plaintiff had control over the truck differential at issue). See generally Johnson and Freeman, *How to Destroy the Plaintiff's Case Where the Plaintiff Has Destroyed the Evidence: A Primer for Succeeding on Summary Judgment Motions Based on Spoilation of Evidence*, IDC Quarterly, vol. 4, No. 3 I (1994) (hereinafter Johnson and Freeman) (collecting the case law).

Indeed, sanctions have been upheld even where no prior court order protecting the information existed. (*Shelbyville Mutual Insurance Co. v. Sunbeam Leisure Products Co.* (1994), 262 Ill. App. 3d 636, 641, 634 N.E.2d 1319, 1323; *American Family Insurance Co.*, 223 Ill. App. 3d at 626, 585 N.E.2d at 1118; *Graves*, 172 Ill. App. 3d at 38, 526 N.E.2d at 681.) For example, in *American Family Insurance Co.*, where an allegedly defective automobile was salvaged by plaintiffs' insurer following an investigation by plaintiffs' expert, this court upheld sanctions and a summary judgment order, stating that the "[p]laintiffs should have known that potential defendants to a case alleging negligence and product liability would undoubtedly want to inspect, as plaintiffs' experts had done, and perhaps test the object alleged to have caused the damage." (*American Family Insurance Co.*, 223 Ill. App. 3d at 627, 585 N.E.2d at 1118.) This court suggested that wiring retained by the plaintiffs and photographs taken by their expert were not a sufficient substitute for an independent investigation by the defense. See *American Family Insurance Co.*, 223 Ill. App. 3d at 628, 585 N.E.2d at 1119.

●4 In this case, the record shows that plaintiffs, through their experts, performed destructive testing on components of the steering gear which they claim is defective, thereby depriving GM of any opportunity to conduct an independent investigation or examination of the steering gear or its components. This conduct clearly falls within the scope of cases such as *Graves* and *American Family Insurance Co.* Given the record on appeal, the trial court did not err in imposing a sanction on plaintiffs for their destructive testing of the steering gear components.

### III

█ The question remains as to whether dismissal of plaintiffs' complaint was the appropriate sanction. In considering whether a particular sanction is "just," a court must consider the conduct that gave rise to the sanction order and the effect of that conduct on the parties. (*Hartnett*, 241 Ill. App. 3d at 173, 607 N.E.2d at 714.) It has been held that a "just" sanction pursuant to Supreme Court Rule 219(c) is one which, to the degree possible, ensures both discovery and a trial on the merits. *Wakefield v. Sears, Roebuck & Co.* (1992), 228 Ill. App. 3d 220, 226, 592 N.E.2d 539, 542.

In this case, the sanctionable conduct is the destructive testing of the steering gear components. The record indicates that the components have not been utterly destroyed. Indeed, the record indicates that the components have been retained and stored by the plaintiffs. Nevertheless, GM claims that the sectioning of the components makes it impossible to perform other types of testing that would have aided its defense.

In *H&H Sand & Gravel Haulers Co. v. Coyne Cylinder Co.* (1994), 260 Ill. App. 3d 235, 632 N.E.2d 697, the subject of plaintiffs' motion to cite supplemental authority, this court was faced with a similar claim. The *H&H* court concluded that the ultimate sanction of dismissal is not warranted when the alteration or destruction of evidence does not cause substantial prejudice such that a party is deprived of establishing his or her case. (See *H&H*, 260 Ill. App. 3d at 244-48, 632 N.E.2d at 373-75; see also *Nehring v. First National Bank* (1986), 143 Ill. App. 3d 791, 493 N.E.2d 1119 (dismissal sanction reversed in case where documents to be produced were stolen); *Ralston*, 129 Ill. App. 3d at 1056-57, 473 N.E.2d at 449 (noting that sanction at issue was not dismissal of the case).) In *Shelbyville Mutual Insurance Co.*, the subject of GM's motion to cite supplemental authority, this court also considered the prejudice suffered by the defendant in affirming the sanctions and summary judgment entered by the trial court. (*Shelbyville Mutual Insurance Co.*, 262 Ill. App. 3d at 642, 634 N.E.2d at 1324.) In *Argueta v. Baltimore & Ohio Chicago Terminal*

*R.R. Co.* (1991), 224 Ill. App. 3d 11, 586 N.E.2d 386, we upheld a trial ruling excluding a metallurgist's report, noting it was within the discretion of the trial court to determine whether parties were prejudiced by destructive testing. (*Argueta*, 224 Ill. App. 3d at 21-22, 586 N.E.2d at 393.) Thus, the cases decided since *Graves* and *American Family Insurance Co.* indicate that the general rule of examining the effect of the sanctionable conduct applies to cases of destructive testing. See Johnson and Freeman, at XI.

In this case, plaintiffs argue that the trial court should have held a hearing to determine whether defendants suffered any prejudice. GM maintains in its brief that prejudice was not

> "simply presumed as in *American Family* and *Graves*. On the contrary, General Motors' experts submitted affidavits and gave depositions establishing the impossibility of running any manual or functional tests on the steering gear because of plaintiff's [*sic*] destructive testing ***."

Plaintiffs respond that their motion for reconsideration, supported by the Bihlmeyer affidavit, raises questions as to whether the inability to run these tests unfairly prejudiced defendant.

The issue thus becomes whether the dismissal was based on a determination that GM was unfairly prejudiced such that GM was unable to establish its case. GM claims that prejudice was not "simply presumed as in *American Family* and *Graves*," but the record clearly indicates that the trial court based its decision on those two cases. It is equally clear that the *H&H* and *Shelbyville Mutual Insurance Co.* opinions, which clarify that prejudice is to be considered, were not available to the trial court when it dismissed plaintiffs' complaint.

GM relies on *Marrocco* to argue that the prejudice is manifest insofar as the destructive testing rendered GM unable to determine what the intact steering gear would have shown. (*Marrocco*, 966 F.2d at 223.) *Marrocco*, however, is a Federal court decision that does not bind this court. Also, the district court in *Marrocco* made factual findings regarding the materiality of the product (and thus the prejudice suffered by the defendant) on the motion to dismiss as a sanction. (*Marrocco*, 966 F.2d at 223.) Moreover, the conduct at issue in *Marrocco* was more egregious than the conduct here; in *Marrocco*, the destructive testing wilfully violated a protective order and plaintiffs' counsel attempted to suborn perjury and conceal the violation of the court order. *Marrocco*, 966 F.2d at 221.

GM also cites *Shelbyville Mutual Insurance Co.* to support its argument that GM is inherently prejudiced because plaintiffs' destructive testing may foreclose certain affirmative defenses. (See *Shelbyville Mutual Insurance Co.*, 262 Ill. App. 3d at 643, 634 N.E.2d

at 1324.) However, the plaintiff in *Shelbyville Mutual Insurance Co.* did not file an affidavit or present evidence to refute the defendant's claim of prejudice. (*Shelbyville Mutual Insurance Co.*, 262 Ill. App. 3d at 642, 634 N.E.2d at 1324.) In this case, plaintiffs submitted an affidavit by an expert disputing whether defendant was prejudiced and whether defendant would have been permitted to perform the tests which the prior destructive testing precludes.

Furthermore, in *Graves* and *American Family Insurance Co.*, two orders were involved in each case; the first barring testimony as a discovery sanction, the second granting summary judgment based on the plaintiff's inability to prove his or her case. When a case is dismissed as a discovery sanction, as in *Nehring, Kmoch* and this case, there may be an increased probability that a trial court will fail to consider whether plaintiff can establish a claim without unfair prejudice to the defendant.

Indeed, in this case, the record shows that the trial court believed it did not need to consider expert opinion on the issue because it interpreted *Graves* and *American Family Insurance Co.* as requiring dismissal. As the above discussion indicates, the severity of a discovery sanction rests within the discretion of the trial court after considering both the conduct of the offending party and the effect of that conduct on the opposing party. A trial court's refusal to exercise its discretion due to its belief that it has none is error; whether such error is reversible depends on the circumstances in each case. *Allstate Insurance Co. v. Rizzi* (1993), 252 Ill. App. 3d 133, 137, 625 N.E.2d 74, 77-78.

In this case, plaintiffs were prejudiced by the complete dismissal of their complaint without a determination that their destructive testing caused substantial prejudice to GM such that GM is deprived of establishing its case. Thus, we conclude that this case must be remanded to the trial court for a hearing on the degree of prejudice suffered by GM and whether such prejudice warrants dismissal or some lesser sanction, *e.g.*, barring certain claims or testimony.

For all of the aforementioned reasons, we affirm the decision of the circuit court of Cook County to impose a sanction, reverse the imposition of dismissal as a sanction and remand the case for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded for further proceedings.

BUCKLEY and O'CONNOR, JJ., concur.